# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EDWARD LESNIAK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 07 C 2948 |
| ) | |
| QUALITY CONTROL CORPORATION and ) | Judge Rebecca R. Pallmeyer |
| QUALISEAL TECHNOLOGY, a corporation, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Edward Lesniak ("Plaintiff") was employed as a an assembler and machinist by Defendant Quality Control Corporation ("QCC") from June 2004 to December 2005. In 2001, prior to his employment with QCC, Plaintiff had suffered a heart attack. During his employment with QCC, Plaintiff underwent several surgeries for an unrelated colon condition. As a result of these surgeries, Plaintiff was at times placed on temporary light work duty. After an incident on November 29, 2005, where Plaintiff left the facility during work hours, QCC terminated Plaintiff for insubordination. In this lawsuit, Plaintiff alleges that QCC discriminated against him in violation of the Americans with Disabilities Act ("ADA"); failed to accommodate his disability or engage in an interactive process with him as required by the ADA; retaliated against him in violation of the ADA; deprived him of benefits in violation of the Employee Retirement Income Security Act ("ERISA"); discriminated against him based on his age in violation of the Age Discrimination in Employment Act ("ADEA"); and violated his rights under the Family and Medical Leave Act ("FMLA"). Defendant QCC seeks summary judgment on all claims. For reasons set forth below, the motion is granted in part and denied in part.

## FACTS

The facts are drawn principally from the parties' Local Rule 56.1 Statements: Defendant Quality Control Corporation's Local Rule 56.1 Statement of Material Facts in Support of Its Motion

for Summary Judgment (hereinafter "QCC 56.1"); Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts (hereinafter "Pl.'s 56.1 Resp."); Plaintiff's Statement of Additional Facts in Opposition to Defendant's Motion for Summary Judgment (hereinafter "Pl.'s 56.1 Stmt."); and Defendant's Response to Plaintiff's Statement of Additional Facts (hereinafter "QCC 56.1 Resp."). Facts are also drawn from the depositions of Plaintiff Edward Lesniak, Keith LeCompte, Rob Stuebing, Jon Cosentino, John Rosa, and Piotr Sroga.

Plaintiff Edward Lesniak, born June 22, 1950, began working as an assembler for Quality Control Corporation (hereinafter "QCC") on or about June 21, 2004. (QCC 56.1 ¶ 9.) As best the court can determine, QCC is an Illinois corporation that manufactures and assembles precision components for machines to be used in markets such as aerospace and diesel fuel systems.[1] Sometime in August 2001, approximately three years before he began his employment with QCC, Plaintiff had suffered a heart attack, which resulted in the surgical placement of stents into his arteries. (*Id.* ¶ 5.) Plaintiff claims that, as a result of his 2001 heart attack, he is "[physically] restricted in many ways, including his ability to walk, run, breathe, lift above ten pounds, exert himself, bend, stretch, do housework, shop, take vacations, mow the lawn, shovel snow, bowl, play sports or work on cars"; and he "cannot walk a city block without being out of breath and feeling exerted." (Pl.'s 56.1 Resp. ¶ 6; Pl.'s Dep., Ex. G to Pl.'s SJM Resp. [hereinafter "Pl.'s Dep."] 195-196, 234-241.) Plaintiff was not, however, placed under any physical restrictions, nor was he given any documentation to provide his employer regarding his 2001 heart attack. (QCC 56.1 ¶ 6; Pl.'s 56.1 Resp. ¶ 6.)

QCC initially employed Plaintiff as an Assembler in its Quality Control Division on the V40 assembly line of its Parker Valve business, where Plaintiff's primary duty was assembling hydraulic

---

[1] This information is on Quality Control Corporation's web site, http://www.qccorp.com (last visited March 24, 2009).

valves.[2] (QCC 56.1 ¶¶ 9, 10.)  According to QCC, the "[hydraulic valves] had an average weight of 10-20 pounds, but could weigh up to approximately 120 pounds." (*Id.* ¶10.)  Plaintiff admits that some of the parts he worked with weighed ten to twenty pounds, but he claims most of them weighed less than five pounds, and that he never assembled a part of any weight close to 120 pounds.  (Pl.'s 56.1 Resp. ¶ 10; Pl.'s Aff., Ex. B to Pl.'s SJM Resp. [hereinafter "Pl.'s Aff."] ¶ 10.) He insists, further, that there was never much lifting involved because the parts were pushed along on an assembly belt and thus did not have to be lifted.  (Pl.'s 56.1 Resp. ¶10.)  Additional duties included the daily cleaning of his work area and, occasionally, a more thorough cleaning in preparation for a visit from a customer, an auditor, or an owner of QCC. (QCC 56.1 ¶¶ 11, 12.)

In late spring 2005, approximately one year after Plaintiff began his employment with QCC, Plaintiff observed blood in his stool and went to the hospital for testing.  (QCC 56.1 ¶ 13.)  At the hospital, Plaintiff underwent a colonoscopy and, although the doctors did not discover the source of the bleeding, they did discover and remove 28 polyps in Plaintiff's colon.  (Pl.'s Dep. 87-88.)  According to Plaintiff, he was diagnosed with Familial Adenomatous Polyposis ("FAP"), a permanent colon condition that requires repeat surgeries.  (Pl.'s 56.1 ¶ 69; Pl.'s Dep. 22-24.) Plaintiff undergoes a colonoscopy every six months and polyps are surgically removed during each colonoscopy.  (Pl.'s 56.1 ¶¶ 69, 70; Pl.'s Dep. 22-23.)

According to Plaintiff, it was around the time of his first colonoscopy in late spring 2005 that either Plaintiff or his wife informed LeCompte and Cosentino about Plaintiff's 2001 heart attack.  (Pl.'s Dep. 62-64.)  Plaintiff claims that, in connection with the colonoscopy, either he or his wife[3]

---

[2] Although the record does not precisely describe the "V40 assembly line" or the "Parker Valve business," Plaintiff testified that the term "V40" is used to identify the size of the hydraulic cylinders being assembled in a particular division. (Pl.'s Dep. 44.) "Parker" is a corporation that presumably contracted with QCC to manufacture or assemble its hydraulic valves.

[3] Plaintiff's testimony about statements made by his wife appears to be hearsay, but Defendant has not objected on this basis.

informed Human Resources Manager Keith LeCompte (hereinafter "LeCompte") and Operations Manager (and supervisor) John Cosentino (hereinafter "Cosentino") about his heart attack and heart condition. (Pl.'s 56.1 Resp. ¶ 8; Pl.'s Dep. 62.) Specifically, Plaintiff claims that the subject of the heart attack arose when, on separate occasions, he explained to LeCompte and Cosentino his need to undergo a stress test for the colonoscopy. (Pl.'s Dep. 62-63.) Plaintiff does not say whether these alleged conversations took place in person or over the phone, precisely when they occurred, or why he could not remember exactly who informed LeCompte or Cosentino about his 2001 heart attack. He simply testified, "I'm not sure if it was me or my wife. We talked to Keith [LeCompte] [about the colonoscopy] . . . and I did mention I had a heart attack in 2001." (Pl.'s Dep. 62.) Plaintiff "believe[s]" he had the same conversation with Cosentino. He admits, however, that he never provided QCC with written documentation regarding his heart attack, nor identify any physical limitations that resulted from it. (Pl.'s 56.1 Resp. ¶ 8; Pl.'s Dep. 64, 65.) QCC insists, to the contrary, that Plaintiff never informed anyone at QCC about his heart attack or heart condition prior to the events leading to Plaintiff's termination. (QCC 56.1 ¶ 8.) LeCompte did not recall Plaintiff's informing him about his 2001 heart attack or a heart condition in any conversation regarding Plaintiff's colonoscopy. (LeCompte Dep., Ex. H to Pl.'s SJM Resp. [hereinafter "LeCompte Dep."] 185.) Cosentino, similarly, testified that Plaintiff never informed his about a heart condition. (Cosentino Dep., Ex. J to Pl.'s SJM Resp. [hereinafter "Cosentino Dep."] 49.)

As a result of his colon condition (not the 2001 heart attack), Plaintiff was absent from work from May 31, 2005 through June 13, 2005, and again on June 21 and 22, 2005. (QCC 56.1 ¶¶ 14, 15.) On June 7, 2005, QCC placed Plaintiff on short-term disability; on June 14, 2005, QCC received a note from one of the doctors who treated Plaintiff's colon condition, Dr. Kyoko Misawa, confirming a previous message that Plaintiff was able to return to work on June 13, 2005, but should be assigned light duty work for two weeks. (QCC 56.1 ¶¶ 16, 17; June 14, 2005 Doctor's Note, Ex. G to QCC SJM; June 6, 2005 Doctor's Note, Ex. F to QCC SJM.) Plaintiff was also

4

restricted from lifting anything over ten pounds during the two-week light work period, which was to end on June 27, 2005. (QCC 56.1 ¶ 17.) When Plaintiff returned to work on June 13, 2005, QCC did place Plaintiff on temporary light duty in the Quality Control Division, where Plaintiff's "primary duties involved secondary operations, subassemblies, deburring parts or cleaning parts that weighed less than one pound." (Pl.'s 56.1 Resp. ¶ 19.) Around June 27, 2005, Plaintiff returned to his regular duties; it is unclear whether this was a return to his work on the V40 assembly line or some other assembly line. (*Id.* ¶ 21.)

Plaintiff took a second leave of absence from QCC in September 2005 to have part of his colon removed. (QCC 56.1 ¶ 24.) During this second leave of absence, QCC received several letters from one of the doctors who treated Plaintiff's colon condition, Dr. Jonathon Wallace, regarding Plaintiff's recovery and return-to-work status; in a letter dated October 20, 2005, the doctor advised that Plaintiff could return to work on October 24, 2005. (*Id.* ¶¶ 26, 27.) The October 20, 2005 letter also stated that Plaintiff should be restricted from lifting anything weighing over ten pounds until November 7, 2005. (*Id.* ¶ 27.) When Plaintiff returned to work on October 24, 2005, QCC again placed Plaintiff on temporary light duty in the Quality Control Division, where Plaintiff's tasks were similar to those he performed while on light duty in June 2005. (*Id.* ¶ 29.)

On or around November 7, 2005, after Plaintiff's light duty restrictions were lifted, QCC moved Plaintiff from its Quality Control Division to its Qualiseal Division, which is in a different location, to assist with machining parts. (*Id.* ¶ 30; LeCompte Dep. 198; Lesniak Dep. 96.) QCC claims that Plaintiff was moved to the Qualiseal Division because there was insufficient light duty work available for him at the Quality Control Division (QCC 56.1 ¶ 30); Plaintiff contends that there was plenty of light duty work available at the Quality Control Division.[4] (Pl.'s 56.1 Resp. ¶ 30.)

---

[4] Although Plaintiff's physical restrictions had expired, QCC chose to keep Plaintiff on light duty; management transferred Plaintiff to Qualiseal because there was light duty work available there.

Plaintiff testified that on or around November 21, 2005, his former supervisor John Rosa–who supervised Plaintiff while working at the Quality Control Division–informed Plaintiff that "they were busy and could use him." (Pl.'s 56.1 Resp. ¶ 30; Pl.'s Dep. 117-18.) After the expiration of Plaintiff's medically-required work restriction on or around November 7, 2005, QCC management, specifically LeCompte, "chose to [err] on the side of caution and keep him within the restrictions of his last doctor's note." (LeCompte Dep. 197.) According to LeCompte, the work available at the Qualiseal Division was less labor-intensive than the work available at the Quality Control Division. (*Id.*) Apart from that testimony, nothing in the record explicitly describes the nature of Plaintiff's Qualiseal duties *vis a vis* his work in the Quality Control Division other than Plaintiff's testimony that, in the Quality Control Division, his primary duties involved pushing parts along an assembly line and that, in the Qualiseal Division, he ran machines and inspected small parts. (Pl.'s 56.1 Resp. ¶ 10; Pl.'s Dep. 96.) Plaintiff also testified that, in running the machines in the Qualiseal Division, he would regularly ask for and receive assistance. (Pl.'s Dep. 97.)

Qualiseal staff began to train Plaintiff on how to run the machines and perform quality checks.[5] (QCC 56.1 ¶ 31.) Piotr Sroga (hereinafter "Sroga"), Plaintiff's group leader, testified that Plaintiff worked primarily with two employees, Rick McCarty and Andy Migas. (Sroga Dep. 69.) The parts that Plaintiff would check were small and weighed less than a pound. (Pl.'s Dep. 96.) Plaintiff also cleaned his work area daily at the end of his shift to ensure that the area would be clean for the next employee. (QCC 56.1 ¶ 32; Pl.'s 56.1 Resp. ¶ 32.) Plaintiff never provided QCC with a doctor's note releasing him to return to full duty in November 2005, but he suggests he did not

---

[5] The record does not explicitly describe the machines that Plaintiff worked with or the precise nature of quality checks that Plaintiff was performing. Sroga testified that he worked with computer numerical controlled ("CNC") machines, which convert raw steel into component parts. (Sroga Dep., Ex. L to Pl.'s SJM Resp. [hereinafter "Sroga Dep."] 16.) Sroga further testified that Plaintiff worked in two cells (a cell contains several unidentified machines); worked on a rollover operation machine (which is not described); and deburred (finished) parts. (*Id.* at 72.) It is also unclear exactly what parts Plaintiff inspected or how they were inspected, other than Plaintiff's testimony that they weighed less than a pound. (Pl.'s Dep. 96.)

realize such a note was required; he notes that he was not required to do so after the expiration of his June 2005 work restrictions. (Pl.'s 56.1 ¶ 37.) Further, Plaintiff contends that QCC never asked for a doctor's note regarding Plaintiff's ability to return to full duty (*id.*); LeCompte, however, testified in his deposition that either he or another employee at QCC did ask Plaintiff for such a note.[6] (LeCompte Dep. 196.) Thus, it is unclear whether QCC management transferred Plaintiff to the Qualiseal division out of an abundance of caution or as a result of Plaintiff's failure to provide a doctor's note.

QCC claims that, in late November 2005, it received notice that an auditor planned to visit the Qualiseal Division and, in order to prepare for the visit, QCC asked employees to perform a thorough cleaning of the work areas. (QCC 56.1 ¶¶ 38, 39.) LeCompte testified that the visit was either a customer audit or a quality system audit.[7] (LeCompte Dep. 204.) Plaintiff claims that he was told the cleaning was in preparation for a visit from a Fire Marshal. (Pl.'s 56.1 Resp. ¶ 38.) Plaintiff also contends that, contrary to QCC's assertion that numerous employees were asked to perform thorough cleaning duties, he "was the only person asked to perform thorough, heavy cleaning of the premises on the day in question."[8] (*Id.* ¶ 39.) In any event, on November 28, 2005, Sroga asked Plaintiff to perform heavy-duty cleaning, which included mopping, emptying four or five 55-gallon drums filled with chips that weighed from 200 to 300 pounds each, and emptying machines of coolant by carrying buckets of coolant that weighed from thirty to forty pounds each. (*Id.* ¶ 40.) After performing these heavy-duty cleaning tasks, Plaintiff "felt like a truck ran over him"

---

[6] LeCompte's testimony that someone else may have requested a doctor's note from Plaintiff constitutes hearsay, but Plaintiff has not specifically objected to LeCompte's testimony on hearsay grounds.

[7] A quality system audit involves a quality inspection by a representative from the International Organization for Standardization ("ISO"). (LeCompte Dep. 204.)

[8] It appears that Plaintiff's conclusion that he was the only employee asked to perform heavy-duty cleaning rests only on his personal observation that no one else was performing the same cleaning duties; the other employees around him were performing machining duties.

and "went home and fell into bed after showering, without even eating." (*Id.* ¶ 42.)

The next morning, on November 29, 2005, Sroga asked Plaintiff to continue performing the cleaning work that Plaintiff had begun the previous day. (QCC 56.1 ¶ 46.) There is a factual dispute as to what happened next. According to Sroga, Plaintiff said that "if cleaning was the only work available for him to perform, he would prefer to go home, then punched out and went home for the day." (QCC 56.1 ¶ 47; Sroga Dep. 101-102.) Plaintiff claims that he told Sroga, "if you don't mind, if [cleaning is] the only thing you have for me to do, I would prefer to go home." (Pl.'s 56.1 Resp. ¶ 47; Pl.'s Dep. 121.) Plaintiff also claims that he explained to Sroga how physically difficult it had been for him to perform the cleaning duties the prior day, and that he expressed concern about being disciplined for leaving. (Pl.'s 56.1 Resp. ¶ 47.) According to Plaintiff, Sroga gave him permission to go home for the day and assurance that he would not suffer any repercussions. (*Id.*) Sroga, on the other hand, contends that he did not give Plaintiff permission to leave and gave no assurance that Plaintiff would not be disciplined. (QCC 56.1 ¶ 47.) Sroga further denies that Plaintiff said anything regarding his physical condition or difficulty performing the heavy-duty cleaning. (Sroga Dep. 103.)

There is also a factual dispute as to whether there was other work available for Plaintiff and whether Plaintiff asked for some other work assignment. According to Sroga, there was no machining work that Plaintiff could have performed on November 29, 2005, and Plaintiff did not ask Sroga if there was any other work that he could perform. Sroga testified that had Plaintiff asked for alternative work, Sroga "would have probably looked for something else." (Sroga Dep. 102.)[9] (QCC 56.1 ¶¶ 46, 48.) Plaintiff contends that by saying, "if that's the only thing you have for me to do,"

---

[9] Although the assertion is not precisely consistent with Sroga's own testimony, the court notes that in its 56.1 Statement of Facts, QCC claims that "Sroga told Lesniak that, at that particular time, he did not have any machining work for Lesniak to do." (QCC 56.1 ¶ 46.) If QCC is correct that Plaintiff never asked for another work assignment, it is curious that Sroga told Plaintiff that machining work was unavailable.

8

he was implicitly asking whether any other work was available. (Pl.'s 56.1 Resp. ¶ 48.) And, according to Plaintiff, other work was indeed available: he asserts that "assembly and machining work was going on that day, and [his] position in Assembly[10] at QCC was busy with work at this time." (*Id.* 49.) Further, Plaintiff contends that QCC "employed temporary employees to do Plaintiff's job and Plaintiff observed work orders sitting at [the Quality Control Division] unfinished." (*Id.*) Specifically, Plaintiff testified that he walked past an assembly line (he does not identify which one) in the Quality Control Division and "[saw] jobs on the table that had to be assembled." (Pl.'s Dep. 119.)

When LeCompte, the Human Resources Manager, learned of the incident, he began his investigation by speaking with Sroga. (QCC 56.1 ¶ 50.) LeCompte does not recall whether Sroga informed him that Plaintiff complained that the heavy-duty cleaning was too physically difficult. (LeCompte Dep. 210.) On November 30, 2005, Plaintiff reported to work and met with LeCompte. (QCC 56.1 ¶ 51.) During this meeting, Plaintiff explained to LeCompte that the cleaning duties he performed on November 28, 2005 were too physically strenuous and that on November 29, 2005, he left work under the impression that he had permission from Sroga to do so. (LeCompte Dep. 213-215; Lesniak Dep. 121-122.) LeCompte claims that this conversation was the first time he learned of Plaintiff's heart condition. (QCC 56.1 ¶ 52.) At the close of the meeting, LeCompte suspended Plaintiff for three days pending further investigation, citing refusal to work and departure from the facility as the reasons for the suspension. (QCC 56.1 ¶ 54.)

LeCompte then informed Rob Stuebing ("Stuebing"), the Qualiseal Division Vice President, that Plaintiff was suspended and that Stuebing would have to find a replacement for Plaintiff during the three-day suspension. (LeCompte Dep. 221-22.) The only other person LeCompte spoke with was John Cosentino, the Operations Manager for the Quality Control Division during this time. (*Id.*

---

[10] It appears that Plaintiff was referring to his former position in the V40 assembly line.

at 224-29.) According to LeCompte, "[b]oth Stuebing and Cosentino informed [him] that there was not a place in Qualiseal Division or Quality Control Division, respectively, for an employee who would refuse to perform assigned work and walk off the job." (QCC 56.1 ¶ 57; LeCompte Dep. 226-27.) At this point, the decision was made that Plaintiff should be terminated. (LeCompte Dep. 229.) LeCompte does not recall whether this was his decision, Cosentino's decision, or a mutual decision. (*Id.* at 229.) Plaintiff argues that LeCompte's investigation was insufficient> He points out that LeCompte did not speak with Sroga again to discuss Plaintiff's allegations; did not interview any witnesses to determine whether Plaintiff was the only employee cleaning or whether other work was available; did not seek medical documentation regarding Plaintiff's heart condition; did not discuss possible accommodations; and only had several, brief conversations with Stuebing and Cosentino. (Pl.'s 56.1 ¶ 55.)

On December 2, 2005, three days after the incident, LeCompte terminated Plaintiff's employment with QCC. (QCC 56.1 ¶ 59.) QCC has a progressive discipline policy, which begins with a verbal warning, and the proceeds with a written verbal warning, final written warning, one-day suspension, three-day suspension, and possible termination. (Pl.'s 56.1 Stmt. ¶ 24.) Plaintiff was never disciplined during his employment with QCC until his suspension and termination in November and December 2005; and it is undisputed that all managers with knowledge of Plaintiff's work performance at QCC and Qualiseal report that Plaintiff was a good performer and had no criticisms of his work performance. (*Id.* ¶¶ 4, 5.) Plaintiff had never refused an assignment prior to the incident leading to his termination. (Pl.'s 56.1 Stmt. ¶ 6.) Further, Cosentino, Plaintiff's Supervisor and Vice President of Operations, testified that the only other example of termination without progressive discipline that he could recall involved an employee that refused to perform an assignment, directed the "F" word at his supervisor, and walked out of the building. (*Id.* ¶ 19.)

Plaintiff contends that QCC replaced him with a younger employee, Onario Solis (hereinafter "Solis"), who is approximately twenty years younger than Plaintiff. Solis was a temporary employee

working in the Quality Control Division as an assembler while Plaintiff was working in the Qualiseal Division. (Pl.'s 56.1 Resp. ¶¶ 78, 80.) According to Plaintiff, some time after he was terminated on December 2, 2005, Solis was hired as a permanent, full-time employee. (*Id.*) LeCompte testified however, that according to QCC's employment records,[11] Solis was hired as a permanent, full-time employee on January 24, 2005. (LeCompte Dep. 235-236.) Further, QCC claims that "[d]ue to a decline in the Parker Valve business . . . QCC has not hired any employees to replace Lesniak on the Parker Valve line." (QCC 56.1 ¶ 80.)

Finally, after QCC terminated Plaintiff's employment, Plaintiff elected COBRA continuation coverage for his health insurance. (*Id.* ¶ 66.) For three months after his termination, however, Plaintiff did not receive his COBRA continuation documents. (*Id.* ¶ 67.) Plaintiff made several calls to QCC requesting the continuation documents and did not receive them until he complained to the Department of Labor. (Pl.'s 56.1 Resp. ¶ 67.) QCC claims that the three-month delay was the result of an administrative error. (QCC 56.1 ¶ 67.) In any event, Plaintiff admits that QCC continued to pay the employer portion of his health insurance premium during this three-month period. (*Id.*) Plaintiff's COBRA coverage began after he complained to the Department of Labor, several months after his termination. (Pl.'s Dep. 276.) When Plaintiff's temporary COBRA insurance coverage expired, he was covered by the health insurance offered by his wife's employer. (QCC 56.1 ¶ 68.) According to Plaintiff, his wife returned to work out of retirement for the purposes of procuring family health insurance because Plaintiff's current employer does not offer health insurance. (Pl.'s 56.1 Resp. ¶ 68.)

## DISCUSSION

Plaintiff alleges that QCC discriminated against him in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12201 *et seq.*; failed to accommodate his disability or

---

[11] QCC did not include these employment records in its summary judgment submission, but Plaintiff has not raised a "best evidence" objection.

engage in an interactive process with him as required by the ADA; retaliated against him in violation of the ADA; deprived him of benefits in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132 *et seq.*; discriminated against him based on his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621, *et seq.*; and violated his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601, *et seq.* Defendant QCC seeks summary judgment on all claims.

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The party who bears the burden of proof on an issue may not rest solely on the allegations made in the pleadings or on speculation, but must affirmatively demonstrate the existence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Springer v. Durflinger*, 518 F.3d 479, 483-84 (7th Cir. 2008).

**I.  Discrimination Under the ADA**

Plaintiff seeks to establish his discrimination claim under the indirect standard of proof, or the burden-shifting *McDonnell Douglas* method. Under this method, Plaintiff has the burden of establishing a *prima facie* case of discrimination; if he does so, QCC can rebut it by presenting a legitimate nondiscriminatory reason for Plaintiff's termination. *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006). Plaintiff then bears the burden of showing that QCC's stated reason for his termination is "simply pretext for discrimination." *Id.* To establish a *prima facie* case of discrimination under the ADA, 42 U.S.C. §12201, *et seq.*, Plaintiff must show: (1) he is disabled within the meaning of the ADA; (2) his work performance met QCC's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances indicate that "it is more likely

12

than not that his disability was the reason for" the adverse action. *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001); *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 794 (7th Cir. 1997).

The initial inquiry here is whether Plaintiff was disabled within the meaning of the ADA. Under the federal regulations interpreting the ADA, a "disability" is defined as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(g); *Kampmier v.v Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007). The record reveals a genuine issue as to whether Plaintiff has a physical impairment that substantially limits his major life activities. Plaintiff testified that, as a result of his 2001 heart attack, he is "[physically] restricted in many ways, including his ability to walk, run, breathe, lift above ten pounds, exert himself, bend, stretch, do housework, shop, take vacations, mow the lawn, shovel snow, bowl, play sports or work on cars"; and he "cannot walk a city block without being out of breath and feeling exerted." (Pl.'s 56.1 Resp. ¶ 6; Pl.'s Dep. 195-196, 234-241.)

In *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005), the court noted that "[t]o be disabled with regard to the major life activity of walking, the employee must be 'substantially limited' in her ability to walk, and the limitation must be permanent or long term, and considerable compared to the walking most people do in their daily lives." The plaintiff in *Sears* "was unable to walk the equivalent of one city block without her right leg and feet becoming numb." *Id.* The court held that a reasonable jury could conclude that the plaintiff's "severe difficulty in walking the equivalent of one city block was a substantial limitation compared to the walking most people do daily." *Id.* Plaintiff here claims that, as a result of his 2001 heart attack, he cannot walk a city block without feeling out of breath. (Pl.'s 56.1 Resp. ¶ 6; Pl.'s Dep. 195-196, 234-241.) Further, Plaintiff testified that after spending a work day cleaning one machine, he "felt like a truck ran over him." (Pl.'s Resp. ¶ 40.) Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that his difficulty with physical exertion is a substantial limitation compared to the

13

daily activities of most people and, thus, Plaintiff is disabled.

Although the court need not reach the issue, Plaintiff has also argued that his colon condition constitutes a disability because it is permanent and thus requires repeat surgeries. (QCC 56.1 ¶ 69; Pl.'s 56.1 Resp. ¶ 69; Pl.'s Dep. 22-24.) Plaintiff undergoes a colonoscopy every six months and, each time, polyps are surgically removed by laparoscope. (Pl.'s 56.1 Resp. ¶¶ 69, 70; Pl.'s Dep. 22-23.) It is undisputed that QCC placed Plaintiff on short-term disability after each colonoscopy. In *Christian v. St. Anthony Med. Ctr.*, 117 F.3d 1051, 1052 (7th Cir. 1997), the court held that "if a medical condition that is not itself disabling nevertheless requires, in the prudent judgment of the medical profession, treatment that is disabling, then the individual has a disability within the meaning of the Act, even though the disability is, as it were, at one remove from the condition." The court cautioned, however, that "the disabling treatment [must] be truly necessary, and not merely an attractive option." *Id.* Plaintiff can satisfy this definition of disability because his colon condition involves the recurrence of polyps that must be surgically removed, resulting after each such procedures in temporary disability.

Plaintiff can establish the second and third elements of his discrimination claim, as well. There is substantial evidence that, aside from the incident in question, Plaintiff always met QCC's performance expectations. And it is undisputed that in being terminated, Plaintiff suffered an adverse employment action. Finally, when viewed in the light most favorable to Plaintiff, the evidence indicates that Plaintiff's disability was causally related to his termination. On one occasion, Plaintiff left work because he could not physically perform the work asked of him. There is evidence from which a jury could conclude that Plaintiff received permission from his supervisor to leave work. Plaintiff had consistently performed his job functions to the satisfaction of his superiors. Yet, despite QCC's policy of progressive discipline, QCC terminated Plaintiff for insubordination, citing the lone incident of Plaintiff leaving work on November 29, 2005. A reasonable jury could conclude that QCC's stated reason for Plaintiff's termination is pretext and

that QCC terminated Plaintiff because of his physical conditions, which, as discussed above, could be considered disabilities under the ADA. Accordingly, QCC's motion for summary judgment is denied.

## II. Failure to Accommodate Under the ADA

To establish a claim for failure-to-accommodate disability discrimination, Plaintiff must show: "(1) that he is disabled; (2) that he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) that the employer failed to make reasonable accommodation." *Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000). The initial inquiry under this claim is whether Plaintiff requested an accommodation for his heart condition.[12] *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998). The facts viewed in the light most favorable to Plaintiff create disputes of fact on this issue, as well. First, Plaintiff contends that, on November 29, 2005, he informed his team leader, Sroga, of his heart condition and his inability to perform the requested work, and inquired whether there was other available work. (Pl.'s 56.1 Resp. ¶ 47.) Second, on November 30, 2005, Plaintiff informed LeCompte that his heart condition prevented him from performing the labor-intensive cleaning duties. (*Id.* ¶ 51.) There is also a genuine issue as to whether Plaintiff had previously informed LeCompte of his 2001 heart attack and subsequent heart condition. Thus, a reasonable jury could conclude that, by notifying his employer of his heart condition in the context of discussing work assignments, Plaintiff requested accommodation for his heart condition.

The next inquiry under Plaintiff's failure to accommodate claim is whether QCC engaged in the interactive process required by the ADA. *Hendricks-Robinson*, 154 F.3d at 693. Assuming that Plaintiff made a reasonable request for accommodation, Plaintiff easily meets his burden on this issue. In its brief, QCC relies on its argument that Plaintiff never requested an accommodation;

---

[12] QCC always made reasonable accommodations for Plaintiff's colon condition; thus, the failure to accommodate claim is necessarily limited to Plaintiff's heart condition.

15

although QCC also argues that if Plaintiff requested accommodation, it did engage in an interactive process, there is no evidence that Sroga or LeCompte ever addressed the possibility of reassignment or other accommodations. QCC's motion for summary judgment on this claim is also denied.

III.     **Retaliation Under the ADA**

To establish a claim for retaliation under the ADA, Plaintiff must present evidence that (1) he engaged in a statutorily protected activity; (2) he suffered from an adverse action; and (3) there is a causal connection between the two. *King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999). The first two prongs of this test require only brief mention. As explained above, there is indeed a genuine issue as to whether Plaintiff requested a reasonable accommodation for his heart condition; such a request would constitute a protected activity under the ADA. Further, there is no question that Plaintiff was terminated three days after the alleged request for accommodation. Thus, the issue becomes whether Plaintiff can establish a causal connection.

To establish the "causal connection," Plaintiff must demonstrate that QCC would not have taken the adverse action but for Plaintiff's engagement in the protected activity. *Id.* Temporal proximity by itself is ordinarily insufficient to establish a causal connection for a retaliation claim. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) (several months separating request for accommodation and adverse action is insufficient to establish causal connection); *E.E.O.C. v. Yellow Freight System, Inc.*, 253 F.3d 943, 952-53 (7th Cir. 2001) (six weeks insufficient). Where there is a very close temporal connection between the protected activity and the adverse action, however, timing can satisfy the causation element of a retaliation case. *See McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997) (two to three day sequence of events satisfies causal connection); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) ("Generally, a plaintiff may establish such a link through evidence that the discharge took place on the heels of protected activity.") In this case Plaintiff was terminated only days after he

16

allegedly engaged in protected activity. Again, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff was terminated because he requested a reasonable accommodation for his heart condition. Accordingly, QCC's motion for summary judgment is denied.

## IV. ERISA Claim

To establish a claim for § 510 ERISA violation, Plaintiff must show: (1) he is a member of the protected class (that is, a beneficiary of an ERISA plan); (2) he was qualified for the position; and (3) he was discharged under circumstances that indicate QCC had a specific intent to deprive him of his right to health insurance or other benefits. 29 U.S.C. §1140; *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998). Although Plaintiff can establish the first two of his claim for a section 510 ERISA violation, there is no evidence that suggests QCC terminated Plaintiff in order to deprive him of his right to benefits. Indeed, Plaintiff must demonstrate *more* than a loss of benefits; Plaintiff "must establish that [QCC] terminated [him] with the specific intent of preventing or retaliating for the use of benefits." *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998); *see Teumer v. General Motos Corp.*, 34 F.3d 542, 550 (7th Cir. 1994) ("A plaintiff seeking relief under § 510 must establish that the complained of action affecting his employment situation was taken by his employer with the specific intent of interfering with his benefit rights."); *Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir. 1991) ("[N]o action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination.") Although there was a three-month delay in processing of Plaintiff's COBRA materials due to an administrative error, QCC continued to pay its portion of Plaintiff's health insurance. (QCC 56.1 ¶ 67.) This belies the notion that QCC made a conscious decision to terminate Plaintiff for the specific purpose of denying him benefits. QCC's motion for summary judgment on this claim is granted.

## V. Age Discrimination Claim

Because Plaintiff has not presented any direct or circumstantial evidence of discrimination, his age discrimination claim is assessed under a variant of the basic *McDonnell-Douglas* burden-shifting framework. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996). To establish a *prima facie* case of age discrimination, plaintiff must show: (1) he is a member of the protected class; (2) he suffered an adverse employment action; (3) he was meeting QCC's legitimate performance expectations; and (4) QCC treated similarly-situated employees not in the protected class more favorably. *Maarouff v. Walker Manufacturing Co.*, 210 F.3d 750, 751 (7th Cir. 2000). Plaintiff can establish the first three elements of his age discrimination claim; but he has not shown that QCC treated similarly situated younger employees more favorably. To establish the fourth element of his age discrimination claim, Plaintiff relies on the unsupported assertion that Solis was hired after Plaintiff was fired as a replacement for Plaintiff. LeCompte testified that Solis was hired as a permanent employee on January 24, 2005, almost a year before QCC terminated Plaintiff. (LeCompte Dep. 235-236.) Absent any evidence to rebut this, Plaintiff is unable to create a genuine issue of material fact. *See Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 767 (7th Cir. 2008) ("unsupported contentions . . . cannot be used to create a genuine issue of material facts.") Summary judgment is granted in favor of QCC.

**VI.    FMLA Claim**

To establish a claim that QCC interfered with Plaintiff's entitlement under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601, *et seq.*, Plaintiff must prove that: (1) he was eligible for FMLA protections; (2) QCC was covered by FMLA; (3) he was entitled to leave under FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) QCC denied him FMLA benefits to which he was entitled. *Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). The parties agree that Plaintiff's leaves were covered by FMLA; indeed, in its motion for summary judgment, QCC states that "[t]he fact that QCC did not administratively designate [Plaintiff's] leave as FMLA leave is inconsequential." (QCC Mot. Summ. J. 14.) The court agrees.

Plaintiff claims that QCC violated FMLA by failing to return Plaintiff to his former position, a benefit to which he was entitled. FMLA requires reinstatement in either the same position or an equivalent position. 29 U.S.C. § 2614(a)(1). Thus, the question is whether Plaintiff's position in the Qualiseal Division was equivalent to his previous position in the Quality Control Division. "The requirement that an employee be restored to the same or equivalent job . . . does not extend to de minimus, intangible, or unmeasurable aspects of the job." 29 C.F.R. 825.215(f). For a substitute position to be considered equivalent, however, it must be "virtually identical to the employee's former position in terms of pay, benefits and working conditions . . . . It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. 825.215(a). The record here contains evidence that the work Plaintiff was asked to perform in the Qualiseal Division was significantly different from the work Plaintiff was asked to do in the Quality Control Division. According to Plaintiff, as an assembler in the Quality Control Division, he rarely lifted anything more than a few pounds, as most of the parts were pushed along on an assembly line. (Pl.'s 56.1 Resp. ¶ 10; Pl.'s Aff. ¶ 10.) By contrast, in the Qualiseal Division, Plaintiff performed heavy-duty cleaning tasks that involved, among other things, carrying thirty to forty pound buckets and cleaning out "millions" of tiny chips that get stuck inside the machines. (Pl.'s 56.1 Resp. ¶ 40; Sroga Dep. 99.) Sroga, Plaintiff's project manager, testified that cleaning the machines is a "tough" job and that it is normal for it to take a full work day to clean one machine. (Sroga Dep. 98-100.) Plaintiff has therefore established a genuine issue as to whether QCC violated FMLA by failing to place Plaintiff in an equivalent position. Summary judgment on this claim is denied.

## **CONCLUSION**

For the foregoing reasons, Defendant QCC's motion for summary judgment is granted with respect to Plaintiff's ERISA claim and his age discrimination claim, and otherwise denied. A status conference is set for Tuesday, April 14, 2009, at 9:00 a.m. The parties are encouraged to discuss

a settlement.

ENTER:

Dated: March 25, 2009

_____
REBECCA R. PALLMEYER
United States District Judge